# In the
# United States Court of Appeals
# for the Fifth Circuit

---

No. 25-30709

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

LARRY MITCHELL,

*Defendant - Appellant*

---

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 3:24-CR-00189

---

## ORIGINAL BRIEF FOR THE APPELLANT
## LARRY MITCHELL

---

**CRISTIE GAUTREAUX GIBBENS**
Federal Public Defender

**DUSTIN C. TALBOT**
Appellate Chief
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Blvd., Ste. 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

*Attorney for the Appellant*

In the
United States Court of Appeals
for the Fifth Circuit

No. 25-30709

UNITED STATES OF AMERICA,
*Plaintiff - Appellee*,

v.

LARRY MITCHELL,
*Defendant - Appellant*

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 3:24-CR-00189

**ORIGINAL BRIEF FOR THE APPELLANT**
**LARRY MITCHELL**

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Judges Below:**

The Honorable Terry Doughty, United States District Judge
The Honorable Kayla McClusky, United States Magistrate Judge

**Defendant - Appellant:**

Larry Mitchell
B.O.P. Reg. No. 74100-510

**Attorneys for the Defendant - Appellant:**

Dustin C. Talbot (on appeal)
Appellate Chief
Betty L. Marak (in the district court)
Assistant Federal Public Defender
Federal Public Defender's Office
Middle and Western Districts of Louisiana

**Attorneys for the Government - Appellee:**

Camille Ann Domingue (on appeal)
Samuel Scott Crichton (in the district court)
Allison Duncan (in the district court)
Assistant United States Attorneys

Lafayette, Louisiana, May 13, 2026.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would materially assist the Court in resolving this appeal. The case presents a novel Fourth Amendment question: whether the government may conduct continuous, warrantless GPS surveillance of a pretrial detainee through an ankle monitor installed under a state-court bail order for the limited purpose of enforcing a residential exclusion zone, and then use the resulting data to investigate the detainee for unrelated criminal offenses. The question sits at the intersection of *Carpenter v. United States*, *Maryland v. King*, and *Florida v. Jimeno*, in a factual context none of those decisions addressed: a court-compelled, bail-condition GPS monitor repurposed by a separate law-enforcement agency for general investigative use.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES ................................................................ viii

STATEMENT OF JURISDICTION........................................................ 1

STATEMENT OF THE ISSUES............................................................. 2

1. Whether the district court erred in denying Mitchell's motion to suppress by concluding that Mitchell lacked a reasonable expectation of privacy in the location data generated by his GPS ankle monitor, where the state-court order required only exclusion-zone enforcement and Mitchell never entered that zone?

2. Whether the district court erred in denying Mitchell's motion to suppress in concluding that Mitchell consented to comprehensive law-enforcement tracking for general criminal investigation in an unrelated case, where the consent given was tied to exclusion-zone enforcement and Mitchell faced the coercive choice of pretrial incarceration or signing the offender agreement?

3. Whether the exclusionary rule requires suppression of the GPS-tainted evidence and its fruits, where the officer accessed the data without a warrant and the magistrate's good-faith and independent-source rulings rest on a corroboration-only framing of the GPS use that the officer's own report contradicts?

STATEMENT OF THE CASE .......... 3

I. The GPS monitoring system .......... 3

A. The state-court bail order and the EM Systems offender agreement .......... 3

B. The Monroe Police Department's parish-wide warrantless GPS access .......... 6

II. The offense conduct .......... 7

A. The federal investigation and the April 2 controlled buy .......... 7

B. The April 25 controlled buy and Detective Cowan's contradiction .......... 8

C. The May 2 pursuit, arrest, and search .......... 9

III. The suppression ruling and conditional plea .......... 11

SUMMARY OF THE ARGUMENT .......... 12

ARGUMENT .......... 16

**I. The district court erred in concluding that Mitchell lacked a reasonable expectation of privacy in the GPS-monitor data.... 16**

A. Standard of review .......... 16

B. Legal authorities .......... 17

C. Argument .......... 19

1. The GPS data here is the comprehensive long-term location data the Fourth Amendment protects .......... 19

2. Mitchell's pretrial-detainee status did not eliminate his Fourth Amendment privacy interest ..................... 20

3. The third-party doctrine does not apply on its own terms, and *Carpenter* confirms that conclusion .......... 23

**II. The district court clearly erred in concluding that Mitchell consented to comprehensive law-enforcement tracking for general criminal investigation ............................................... 24**

A. Standard of review ........................................................ 24

B. Legal authorities............................................................ 25

C. Argument ........................................................................ 27

1. The consent given was tied to exclusion-zone enforcement; general criminal investigation falls outside its scope ......................................................... 27

2. The consent was not voluntary .................................... 30

**III. The good-faith and independent-source exceptions do not save the GPS-tainted evidence ..................................................... 33**

A. Standard of review ........................................................ 33

B. Legal authorities............................................................ 33

C. Argument ........................................................................ 34

1. Cowan's conduct does not qualify for the good-faith exception under *Leon* or *Herring*................................ 35

2. The warrants were not "supported by independent and corroborated evidence beyond the GPS ankle monitor data" ............................................................ 37

CONCLUSION ........................................................................................ 41

CERTIFICATE OF SERVICE ............................................................. 43

CERTIFICATE OF COMPLIANCE ..................................................... 43

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290 (5th Cir. 2019) ............... 28

*Brown v. Illinois*, 422 U.S. 590 (1975) ............................................... 40-41

*Carpenter v. United States*, 585 U.S. 296 (2018) ........................... *passim*

*Commonwealth v. Norman*, 484 Mass. 330 (Mass. 2020) ................. 30-31

*Florida v. Jimeno*, 500 U.S. 248 (1991) ....................................... 14, 25-27

*Grady v. North Carolina*, 575 U.S. 306 (2015) ....................................... 17

*Herring v. United States*, 555 U.S. 135 (2009) .................................. 33-37

*IberiaBank Corp. v. Ill. Union Ins. Co.*, 953 F.3d 339 (5th Cir. 2020) ... 28

*Katz v. United States*, 389 U.S. 347 (1967) ........................................... 17

*Mapp v. Ohio*, 367 U.S. 643 (1961) ........................................................ 33

*Maryland v. King*, 569 U.S. 435 (2013) ..................................... 13, 20, 22

*Murray v. United States*, 487 U.S. 533 (1988) ................................ 34, 39

*Riley v. California*, 573 U.S. 373 (2014) ................................................. 22

*Samson v. California*, 547 U.S. 843 (2006) ........................................ 22-23

*Smith v. Maryland*, 442 U.S. 735 (1979) .............................. 14, 18, 23-24

*United States v. August*, 136 F.4th 595 (5th Cir. 2025) .................. 33, 38

*United States v. Bell*, 832 F. App'x 298 (5th Cir. 2020) (unpublished) . 33

*United States v. Calandra*, 414 U.S. 338 (1974) .................................... 33

*United States v. Cooke*, 674 F.3d 491 (5th Cir. 2012) .......... 16

*United States v. Flores*, 63 F.3d 1342 (5th Cir. 1995) .......... 26

*United States v. Freeman*, 482 F.3d 829 (5th Cir. 2007) .......... 24

*United States v. Gallegos-Espinal*, 970 F.3d 586 (5th Cir. 2020) .......... 25-26

*United States v. Gomez*, 276 F.3d 694 (5th Cir. 2001) .......... 16-17

*United States v. Iraheta*, 764 F.3d 455 (5th Cir. 2014) .......... 25

*United States v. Jones*, 565 U.S. 400 (2012) .......... 17, 20

*United States v. Karo*, 468 U.S. 705 (1984) .......... 19-20

*United States v. Knights*, 534 U.S. 112 (2001) .......... 22

*United States v. Knotts*, 460 U.S. 276 (1983) .......... 19

*United States v. Leon*, 468 U.S. 897 (1984) .......... 15, 33, 35-36

*United States v. Miller*, 425 U.S. 435 (1976) .......... 18, 23-24

*United States v. Satterwhite*, 980 F.2d 317 (5th Cir. 1992) .......... 33

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) .......... 17

*United States v. Soriano*, 976 F.3d 450 (5th Cir. 2020) .......... 24-26, 30-32

*Wong Sun v. United States*, 371 U.S. 471 (1963) .......... 33

**CONSTITUTIONAL PROVISIONS & STATUTES**

U.S. CONST. amend. IV .......... *passim*

18 U.S.C. § 3231 .......... 1

18 U.S.C. § 3742 .......... 2

28 U.S.C. § 1291 .......... 2

Fed. R. Crim. P. 11(a)(2) .......... 11

In the
United States Court of Appeals
for the Fifth Circuit

No. 25-30709

UNITED STATES OF AMERICA,
*Plaintiff - Appellee*,

v.

LARRY MITCHELL,
*Defendant - Appellant*

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 3:24-CR-00189

**ORIGINAL BRIEF FOR THE APPELLANT
LARRY MITCHELL**

## STATEMENT OF JURISDICTION

This matter originated in the United States District Court for the Western District of Louisiana. The district court's jurisdiction arose under 18 U.S.C. § 3231 inasmuch as the action involved an allegation of an offense against the United States. This is an appeal of a final judgment entered by the district court on December 3, 2025. ROA.203-

08. Appellant filed a timely notice of appeal on December 4, 2025. ROA.209. As such, this Court's jurisdiction to review the matter is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in denying Mitchell's motion to suppress by concluding that Mitchell lacked a reasonable expectation of privacy in the location data generated by his GPS ankle monitor, where the state-court order required only exclusion-zone enforcement and Mitchell never entered that zone?

2. Whether the district court erred in denying Mitchell's motion to suppress in concluding that Mitchell consented to comprehensive law-enforcement tracking for general criminal investigation in an unrelated case, where the consent given was tied to exclusion-zone enforcement and Mitchell faced the coercive choice of pretrial incarceration or signing the offender agreement?

3. Whether the exclusionary rule requires suppression of the GPS-tainted evidence and its fruits, where the officer accessed the data without a warrant and the magistrate's good-faith and independent-

source rulings rest on a corroboration-only framing of the GPS use that the officer's own report contradicts?

## STATEMENT OF THE CASE

This case presents the question whether law-enforcement officers in an unrelated criminal investigation may conduct continuous, warrantless GPS surveillance of a pretrial detainee whose ankle monitor was installed for the limited purpose of enforcing a residential exclusion zone the detainee never entered. Detective Anthony Cowan of the Monroe Police Department used a single shared log-in to access the GPS data of any pretrial detainee in Ouachita Parish, and used that data to investigate Larry Mitchell for narcotics offenses unrelated to the state case in which Mitchell was ordered to wear the monitor. The district court denied suppression.

### I. The GPS monitoring system

#### A. The state-court bail order and the EM Systems offender agreement

On January 25, 2024, the Fourth Judicial District Court for Ouachita Parish ordered Mitchell to wear a GPS ankle monitor as a condition of pretrial release in an unrelated state case involving domestic-abuse-battery and related charges. ROA.104-05. The order

specified that the sole purpose of the monitor was to ensure that Mitchell did not enter within 1,000 feet of the alleged victim's residence. ROA.104; *see also* ROA.336 (The owner of monitoring system company confirming the sole purpose was exclusion-zone enforcement).

The order also identified who would supervise the monitoring and who would receive service of the order. The supervising entity was "Innovative Monitoring Network," not the Monroe Police Department. ROA.105; ROA.270 (Cowan testifying that the court order does not list anyone except Innovative Monitoring Network). The recipients of service were the defendant, the district attorney, the court, the Ouachita and Morehouse Parish correctional centers, and the ankle-monitoring company. ROA.105. Neither the Monroe Police Department nor the Ouachita Parish Sheriff's Office was listed. ROA.105.

Mitchell selected EM Systems as his monitoring company and signed an offender agreement with an EM Systems employee at the time of installation. ROA.107-09; ROA.321-23. The agreement's paragraph fourteen provided:

> If you are being monitored by a GPS device as part of this agreement, you understand that all information related to your location while in the monitoring program is property of EM Systems and any Sheriff's Department, judicial agency,

> law enforcement agency, or any other entity *involved in the ordering or enforcement of your electronic monitoring program*.

ROA.108 (emphasis added). The agreement's grant of access was tied to the monitoring program. It did not name the Monroe Police Department or the Ouachita Parish Sheriff's Office, and it did not authorize any agency to log in at any time to investigate the wearer's past or current location for unrelated criminal purposes. ROA.327 (Cage confirming the agreement does not state that law enforcement can login at any time to investigate a person's past and current location). Mitchell was monitored by EM Systems on this case from January 26, 2024 until May 3, 2024. ROA.177.

The state-court order and the offender agreement together defined the surveillance Mitchell agreed to: a device that would alert authorities if he came within 1,000 feet of the alleged victim's residence. ROA.104, 108. He never came within that distance. ROA.176 (Magistrate court finding that "[a]t no time during the time period of November 28, 2023, to May 2, 2024, did Mitchell enter into the exclusion zone."); ROA.271-72 (Cowan confirming he was not aware of any exclusion-zone breach during the federal investigation period).

### B. The Monroe Police Department's parish-wide warrantless GPS access

Detective Cowan and his fellow officers had a single shared log-in to the EM Systems program that allowed any officer in the Monroe Police Department to view the real-time and historical location of any GPS-monitored pretrial detainee in Ouachita Parish, not merely individuals within MPD's own caseload. ROA.229, 330. The log-in was shared. Cage testified that he could not tell which officer accessed the data when multiple officers used a single credential. ROA.331. And he agreed that an officer could use this access to begin a new investigation of a wearer in a case unrelated to the case for which the wearer was ordered to be monitored. ROA.335. That is what occurred here.

The monitoring program itself is cloud-based and reachable from any device with internet access. ROA.272, 307. An authorized user can view in real time the exact location of any wearer in the relevant jurisdiction. ROA.339 (Cage testifying that the software "uses exact location" with location accuracy "within six feet"). The program tracks the wearer's location every second, every hour, every minute, and every day, twenty-four hours a day. ROA.332. It retains location data dating back to its inception. ROA.329.

Detective Cowan obtained no warrant before accessing the GPS data and no consent from Mitchell beyond the EM Systems offender agreement Mitchell had signed at installation. ROA.261, 294.

## II. The offense conduct

### A. The federal investigation and the April 2 controlled buy

Detective Cowan's investigation of Mitchell began on November 28, 2023, with a tip from a confidential source identifying Mitchell as a narcotics distributor in Ouachita Parish. ROA.218. Cowan worked the case for roughly six months using standard investigative techniques and identified Mitchell's residence and the vehicles Mitchell drove before he learned that Mitchell was wearing an ankle monitor. ROA.219-21.

On April 2, 2024, law enforcement conducted the first controlled purchase from Mitchell, twenty fentanyl pills for two hundred dollars at a local gas station. ROA.225. Cowan and other officers conducted physical surveillance of the transaction. ROA.225-26. Cowan testified that the first controlled purchase was completed without any use of GPS data. ROA.226-27.

### B. The April 25 controlled buy and Detective Cowan's contradiction

On April 25, 2024, law enforcement conducted a second controlled purchase, ninety-six grams of methamphetamine for six hundred dollars at a Johnny's Pizza in Ouachita Parish. ROA.227. Cowan testified that he first learned of the existence of Mitchell's GPS ankle monitor on April 25, 2024, *after* the second controlled purchase had concluded. ROA.219. According to Cowan, Agent Tyler Dooley alerted him to the monitor while Dooley was viewing the EM Systems site for unrelated reasons. ROA.228-29.

Cowan's contemporaneous report tells a different story. The magistrate court findings quote the report's entry for April 25, 2024: "[i]t should be noted that due to the limited number of narcotic agents . . . conducted surveillance will be electronically monitored to Mitchell being on his ankle monitor." ROA.174; *see also* ROA.250 (Cowan reading the same entry on the stand). The report describes electronic monitoring during the April 25 controlled buy itself; Cowan's testimony places his knowledge of the monitor only after the buy. The magistrate did not separately address the inconsistency and credited Cowan's testimony

that the GPS was used "only to corroborate information already gathered through traditional investigative methods" after April 25. ROA.187

The arrest-warrant affidavit Cowan later prepared also misidentified the case in which Mitchell was being monitored. The affidavit referred to a 2022 attempted-murder ankle monitor that was no longer in use, rather than to the 2024 domestic-abuse-battery ankle monitor Cowan was actually accessing. ROA.187 (magistrate judge findings in footnote 1).

### C. The May 2 pursuit, arrest, and search

On May 2, 2024, two confidential sources told Cowan that Mitchell was traveling to Houston to acquire narcotics. ROA.230. Cowan obtained an arrest warrant for Mitchell based on the two prior controlled purchases. ROA.230. The plan was to arrest Mitchell when he returned to Ouachita Parish. That afternoon, Cowan and Sergeant Mahoney positioned themselves east of Minden to intercept Mitchell. ROA.234. They located Mitchell using both license-plate-reader data and his GPS ankle monitor. ROA.234; ROA.273 (Cowan confirming "Yes, ma'am, it was one of the factors"). Cowan's arrest-warrant affidavit stated, "during this investigation with the help of electronic surveillance your Affiant

was able to confirm that Mitchell does in fact make frequent trips to Houston TX from Monroe La." ROA.167 (magistrate court quoting search-warrant affidavit).

Officers from the Ouachita Parish Special Crimes Apprehension Team conducted a traffic stop after Mitchell entered Ouachita Parish. ROA.235. Mitchell pulled over briefly, then sped off, leading officers on a fifteen-mile pursuit. ROA.235-36. Mitchell eventually stopped, exited the vehicle holding a gift bag, threw the bag, and fled on foot before being apprehended by a K-9 unit. ROA.237. Officers recovered three kilograms of methamphetamine from the gift bag. ROA.237.

After the arrest, Cowan obtained and executed a search warrant for Mitchell's residence. ROA.238. The warrant affidavit included the GPS-derived information about Mitchell's movements. ROA.187-88 (magistrate judge finding that "the search warrant was supported by multiple sources of information, including . . . the GPS ankle monitor data"). The search recovered methamphetamine, marijuana, crack cocaine, powder cocaine, fentanyl pills, hydrocodone pills, ecstasy pills, and promethazine bottles. ROA.167. Mitchell was *Mirandized*, gave a

statement, and unlocked his cell phone. ROA.240-41. Officers obtained a separate warrant for the phone the following day. ROA.167.

## III. The suppression ruling and conditional plea

Mitchell was indicted on September 4, 2024, on three counts of possession with intent to distribute methamphetamine, fentanyl, and cocaine. ROA.13-15. Mitchell filed a motion to suppress on November 27, 2024. ROA.24-79. After a January 29, 2025 hearing, the magistrate judge issued a Report and Recommendation on May 28, 2025, recommending denial of the motion. ROA.165-90. Mitchell objected. ROA.191-95. The district court adopted the Report and Recommendation on June 11, 2025. ROA.196.

On August 14, 2025, Mitchell pleaded guilty to counts one and two of the indictment pursuant to a written plea agreement that reserved his right to appeal the suppression denial under Federal Rule of Criminal Procedure 11(a)(2) notwithstanding the agreement's separate sentencing-related appeal waiver. ROA.197, 424. The reservation paragraph provided:

> The government acknowledges that this is a conditional plea, pursuant to Federal Rule of Criminal Procedure 11(a)(2), and that the defendant reserves his right to appeal the Court's adverse ruling as to the defendant's Motion to Suppress, and

> should such appeal be successful, the defendant shall be allowed to withdraw his guilty plea.

ROA.424. The change-of-plea colloquy confirmed the conditional-plea posture on the record. ROA.371-72. On December 3, 2025, the district court sentenced Mitchell to 235 months on each of counts one and two, to run concurrently. ROA.201. Judgment was entered the same day. ROA.203-08. Mitchell filed a timely notice of appeal on December 4, 2025. ROA.209.

## SUMMARY OF THE ARGUMENT

Detective Cowan had no warrant when he began tracking Larry Mitchell through the EM Systems GPS portal. He never obtained one. He and his colleagues used a shared, parish-wide log-in to pull the real-time and historical location of any GPS-monitored pretrial detainee in Ouachita Parish, continuously, for as long as the program retained data. That is not the corroborative cross-check the court below found. It is comprehensive, warrantless surveillance that violates the Fourth Amendment.

*First,* Mitchell had a reasonable expectation of privacy in four months of continuous GPS location data. The Supreme Court in *Carpenter* held that comprehensive long-term location data retains

Fourth Amendment protection even when a third party holds it. The GPS ankle monitor is a stronger case than the cell-site records *Carpenter* addressed. It tracks the wearer's exact location within six feet, every second of every day, indefinitely. *Carpenter*'s holding is not limited to cell phones; it rests on the nature of comprehensive location data. The Court made that explicit when it described cell-site records as achieving "near perfect surveillance, as if it had attached an ankle monitor to the phone's user." This case involves the very ankle monitor *Carpenter* warned against.

The magistrate concluded that Mitchell had diminished privacy interests as a pretrial arrestee, citing *Maryland v. King*. That reasoning misreads *King*. *King* applied a balancing test to a one-time cheek-swab DNA collection at booking, a brief, narrowly defined intrusion tied to the identification process. It did not announce a categorical rule eliminating Fourth Amendment protection for all arrestees in all contexts. The balancing here is not close. A single DNA swab at booking is nothing like four months of continuous GPS tracking for the benefit of an investigating agency the bail order never mentioned.

The third-party doctrine does not apply either. Mitchell did not voluntarily share his location with law enforcement for investigative purposes; he complied with a state-court order. And even if the doctrine were triggered, *Carpenter* expressly declined to extend *Smith v. Maryland* to comprehensive location data. "Individuals have a reasonable expectation of privacy in the whole of their physical movements." That language reaches the ankle monitor directly.

*Second,* the offender agreement did not authorize the use of Mitchell's GPS data in an unrelated investigation. The state-court bail order defined the scope of the monitoring: a GPS monitor to ensure Mitchell did not enter within 1,000 feet of the alleged victim's residence. That was the expressed object of the consent. The EM Systems offender agreement authorized access by entities "involved in the ordering or enforcement of" the monitoring program. *Florida v. Jimeno* directs the Court to ask what an objectively reasonable person would understand the consent to authorize. No objectively reasonable person reading that language against that bail order would understand it to authorize any law-enforcement officer with any agency to track the wearer for any purpose at any time. EM Systems' own owner confirmed as much: the

agreement does not authorize law enforcement to "log in at any time to investigate a person's past and current location."

The consent was also not voluntary in the constitutionally meaningful sense. Mitchell's choice was jail or sign. A pretrial detainee facing continued confinement as the alternative does not freely consent when he accepts a bail condition. Acquiescence to wearing the monitor reflects the coerced choice the state court imposed. It does not reflect knowing consent to repurposing the resulting data for an investigation of unrelated drug offenses by a department the bail order never mentioned.

*Finally,* neither the good-faith exception nor the independent-source doctrine rescues the GPS-tainted evidence. *Leon* does not apply to warrantless conduct. The threshold question is not whether Cowan relied in good faith on a warrant; it is whether he had a warrant at all. He did not. He accessed the GPS data with no warrant, no magistrate authorization, and no individualized determination that his use of the monitoring portal was constitutionally permissible. *Leon*'s good-faith exception has no purchase in that posture.

The independent-source doctrine fails for a different reason: the GPS contaminated the investigation before the warrants were sought.

The April 25 controlled buy, one of the two acts of distribution the residence warrant relied on for probable cause, was GPS-assisted. Cowan's own report says so: "conducted surveillance will be electronically monitored to Mitchell being on his ankle monitor." That entry describes GPS as the means of conducting surveillance during the buy itself, not as a post-hoc corroborative cross-check. When the April 25 buy is excised from the warrant affidavit as a fruit of the unlawful access, what remains is a single controlled purchase on April 2 and general pre-GPS physical surveillance. That is a materially weaker probable cause showing than the one the magistrate approved.

## ARGUMENT

### I. The district court erred in concluding that Mitchell lacked a reasonable expectation of privacy in the GPS-monitor data

#### A. Standard of review

This Court reviews findings of fact on a motion to suppress for clear error and reviews questions of law *de novo*. *United States v. Cooke*, 674 F.3d 491, 493 (5th Cir. 2012). The Court views the evidence in the light most favorable to the prevailing party, here the government. *Id.* Whether a person has a reasonable expectation of privacy is a question of law

reviewed de novo. *United States v. Gomez*, 276 F.3d 694, 697 (5th Cir. 2001).

### B. Legal Authorities

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A Fourth Amendment search occurs when the government invades an area in which a person has manifested a subjective expectation of privacy that society is prepared to recognize as reasonable. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *see also United States v. Smith*, 110 F.4th 817, 830 (5th Cir. 2024) (holding that a Fourth Amendment privacy interest is infringed when the government physically intrudes on a constitutionally protected area or when the government violates a person's "reasonable expectation of privacy."). Attaching a tracking device to a person for the purpose of monitoring that person's movements is itself a Fourth Amendment search. *Grady v. North Carolina*, 575 U.S. 306, 309-10 (2015). The Supreme Court reached the same conclusion in *United States v. Jones*, 565 U.S. 400, 404-05 (2012), under a property-trespass theory, with five Justices concurring that prolonged GPS

surveillance also implicates the reasonable-expectation-of-privacy strand of the Fourth Amendment. *Id.* at 415-17 (Sotomayor, J., concurring); *id.* at 430 (Alito, J., concurring in the judgment).

In *Carpenter v. United States*, 585 U.S. 296 (2018), the Supreme Court held that the Fourth Amendment protects against the warrantless acquisition of comprehensive long-term location data even when the data is held by a third party. The Court reasoned that "individuals have a reasonable expectation of privacy in the whole of their physical movements," *id.* at 310, and that comprehensive location data "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user," *id.* at 312. The Court declined to extend the third-party doctrine of *Smith v. Maryland*, 442 U.S. 735 (1979), and *United States v. Miller*, 425 U.S. 435 (1976), to that category of data. *Carpenter*, 585 U.S. at 313-16. The *Carpenter* Court was careful to limit its holding to historical cell-site location information of sufficient duration, *id.* at 309-10, 316, but the principle it applied extends to the comprehensive GPS data at issue here.

## C. Argument

### 1. The GPS data here is the comprehensive long-term location data the Fourth Amendment protects

The GPS ankle monitor recorded Mitchell's movements throughout Ouachita Parish continuously for over four months. ROA.331-32. EM Systems retained that data indefinitely. ROA.329. Detective Cowan and his fellow officers had open access to it through a parish-wide log-in. ROA.229-30. The monitor itself, by design, "achieves near perfect surveillance" of the wearer.[1] *Carpenter*, 585 U.S. at 312.

Continuous GPS monitoring of this kind is qualitatively different from the short-term surveillance the Supreme Court has held unprotected. In *United States v. Knotts*, 460 U.S. 276 (1983), the Court held that brief beeper-assisted tracking of a vehicle on public roads did not implicate the Fourth Amendment. The Court took pains to note that the case involved no "twenty-four hour surveillance" and reserved the question of "dragnet" location tracking. *Id.* at 283-84. The companion case

[1] Detective Cowan brazenly tried to minimize this by testifying that the GPS was not real-time and was less precise than a license-plate reader. ROA.276. The owner of EM Systems, Shelby Cage, contradicted that testimony. Cage testified that the software "uses exact location" with location accuracy "within six feet." ROA.339. The magistrate court did not credit Cowan's minimization. *See* ROA.177 ("The location can be viewed in real time.").

*United States v. Karo*, 468 U.S. 705 (1984), held that beeper monitoring *did* implicate the Fourth Amendment when it revealed information from inside a private residence. *Id.* at 714-18. *Jones* and *Carpenter* carried *Karo*'s recognition forward into the digital age. Comprehensive long-term location data reveals "a wealth of detail about [the wearer's] familial, political, professional, religious, and sexual associations." *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring). The Fourth Amendment guards that detail.

### 2. Mitchell's pretrial-detainee status did not eliminate his Fourth Amendment privacy interest

The magistrate concluded that Mitchell qualified as "an arrestee with a diminished expectation of privacy under established precedent," ROA.179, citing *Maryland v. King*, 569 U.S. 435, 463 (2013). The premise is correct in some contexts. But *King* did not announce a blanket rule; it announced a balancing test. The Court evaluated whether the legitimate government interests served by the challenged search were enough to overcome the arrestee's reduced expectation of privacy under all the circumstances. *Id.* at 462-65. The balancing here tips for Mitchell.

On the intrusion side, the search at issue was qualitatively unlike the search the *King* Court upheld. *King* addressed a single brief cheek-

swab DNA collection at booking, performed for the specific purpose of identification and analyzed against an established forensic database. *Id.* at 442-44. The intrusion was one-time, brief, narrowly defined, and tied to the booking process itself. The intrusion here was none of those. It was continuous over months, comprehensive in scope, and conducted entirely outside the monitoring framework the state court ordered.

On the government-interest side, the question is what interest justified *this* search, the warrantless extraction of bail-compliance GPS data for use in an unrelated criminal investigation. The government has characterized the interest broadly as "narcotics enforcement." That framing collapses two distinct inquiries. The state court that imposed the monitoring identified one government interest, ensuring Mitchell did not breach the 1,000-foot exclusion zone, and made that interest the predicate for compelling Mitchell to wear the device. ROA.104. The monitoring program was the means of advancing that interest. Detective Cowan's subsequent decision to use the program for a different investigation served a different interest, and that different interest was not authorized by the issuing court, was not contemplated by the offender agreement, and would, on the government's framing, allow any law-

enforcement agency to repurpose any court-ordered monitoring data for any investigation it pleased. *King*'s balancing was framed around the specific interest the challenged search advances. It does not authorize the wholesale repurposing the government did here. *See King*, 569 U.S. at 462-65. As the Supreme Court has reaffirmed, "[t]he fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely." *Riley v. California*, 573 U.S. 373, 392 (2014).

The probationer-and-parolee cases are doctrinally distinct. Mitchell had not been convicted in the state case. He was a pretrial detainee released on bail, presumed innocent of the state charges. This distinguishes *United States v. Knights*, 534 U.S. 112 (2001), and *Samson v. California*, 547 U.S. 843, 852-57 (2006), where the Supreme Court upheld searches of probationers and parolees on the strength of sentencing-related liberty diminution incident to the underlying conviction. *See Knights*, 534 U.S. at 119 ("Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty,'" thus probationer's "status as a probationer subject to a search condition informs both sides of that

balance"); *Samson*, 547 U.S. at 852 ("parolees . . . have severely diminished expectations of privacy by virtue of their status alone"). That diminution does not extend to pretrial detainees on bail.

### 3. The third-party doctrine does not apply on its own terms, and *Carpenter* confirms that conclusion

The third-party doctrine of *Smith v. Maryland* and *United States v. Miller* rests on the premise that "an individual has a reduced expectation of privacy in information knowingly shared with another." *Carpenter*, 585 U.S. at 314 (describing the rationale); *see also Smith*, 442 U.S. at 743-44 (describing circumstances where someone *voluntarily* turns their information over to third parties). The doctrine does not apply here on its own terms because Mitchell did not "voluntarily" share his location with law enforcement for general criminal-investigation purposes. The state-court order required Mitchell to wear the monitor as a condition of release, and the order specified the sole purpose as exclusion-zone enforcement. ROA.104. The EM Systems offender agreement was the contractual instrument that effected the court-ordered monitoring. Nothing about it represented a free-standing voluntary disclosure to law enforcement for general investigative use. *See infra* Part II.C(1).

Even if the third-party doctrine were triggered, *Carpenter* forecloses its application to comprehensive long-term location data. The Court declined to extend *Smith* and *Miller* "to the qualitatively different category of cell-site records," reasoning that "individuals have a reasonable expectation of privacy in the whole of their physical movements." 585 U.S. at 309-10. The Court emphasized that the third-party doctrine rationale does not extend to "the deeply revealing nature" of comprehensive location data. *Id.* at 320. Mitchell's GPS-monitor data is comprehensive in the same sense *Carpenter* identified: every second of every day of his movements throughout Ouachita Parish for over four months.

## II. The district court clearly erred in concluding that Mitchell consented to comprehensive law-enforcement tracking for general criminal investigation

### A. Standard of review

Whether a defendant consented to a search is a question of fact reviewed for clear error. *United States v. Freeman*, 482 F.3d 829, 831-32 (5th Cir. 2007); *United States v. Soriano*, 976 F.3d 450, 455 (5th Cir. 2020). A finding of fact is clearly erroneous if, on the entire evidence, the reviewing court is "left with the definite and firm conviction that a

mistake has been committed." *Soriano*, 976 F.3d at 455. Where, as here, the denial of a suppression motion is based on live testimony at a hearing, "the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *Id.* In addition to deferring to the district court's factual findings, this Court must "review the evidence in the light most favorable to the prevailing party," here, the Government. *Id.*

In contrast, the legal questions, such as "the scope of consent to a search is a question of law that [this Court] review[s] *de novo*." *United States v. Gallegos-Espinal*, 970 F.3d 586, 591 (5th Cir. 2020) (quoting *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014)).

### B. Legal authorities

Consent to a search must be voluntary, and it must be measured by what the consenting person objectively conveyed. In *Florida v. Jimeno*, 500 U.S. 248 (1991), the Supreme Court held that the scope of a consent search is "generally defined by its expressed object," and that the standard for measuring scope is what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Id.* at 251. Although the *Jimeno* standard focuses on the term

"exchange," which usually occurs orally between the parties at the scene of the event, this Court has previously applied it to written consents. *See Gallegos-Espinal*, 970 F.3d at 591 (citing *United States v. Flores*, 63 F.3d 1342, 1362 (5th Cir. 1995)).

The objective-reasonableness rule *Jimeno* articulates governs the scope of consent in consent-based searches, and it applies to consent given for GPS monitoring as a condition of pretrial release: the question is whether an objectively reasonable person in Mitchell's position would have understood the consent to authorize the use that occurred.

Voluntariness is determined under the totality of circumstances, with this Court examining six factors:

> (1) the voluntariness of the defendant's custodial status;
> (2) the presence of coercive police procedures;
> (3) the extent and level of the defendant's cooperation with the police;
> (4) the defendant's awareness of his right to refuse to consent;
> (5) the defendant's education and intelligence; and
> (6) the defendant's belief that no incriminating evidence will be found.
>
> No single factor is dispositive.

*Soriano*, 976 F.3d at 455.

### C. Argument

#### 1. The consent given was tied to exclusion-zone enforcement; general criminal investigation falls outside its scope

Under *Jimeno*, the question is what an objectively reasonable person would have understood the consent to authorize. 500 U.S. at 251. The state-court order answered that question. The order specified the sole purpose of the GPS monitor: ensuring that Mitchell did not enter within 1,000 feet of the alleged victim's residence. ROA.104, 336. The order directed that Mitchell would be supervised by Innovative Monitoring Network, not by the Monroe Police Department. ROA.270. It did not designate MPD as a recipient of service or as an agency authorized to track Mitchell for any purpose. ROA.105. The "expressed object" of the monitoring, *Jimeno*, 500 U.S. at 251, was exclusion-zone enforcement. An objectively reasonable person in Mitchell's position would understand the consent given to be tied to that purpose.

The EM Systems offender agreement, read for its plain meaning, confirms that scope. Paragraph fourteen authorizes access by four categories of entity: "EM Systems and any Sheriff's Department, judicial agency, law enforcement agency, or any other entity *involved in the*

*ordering or enforcement of* [the] electronic monitoring program." ROA.108 (emphasis added). Two considerations show that the qualifying phrase modifies every item in the list, not merely the residual catch-all. *First*, under the canon of *ejusdem generis*, where general words follow a list of specific words, the general words take their meaning from the specific ones. The four categories here share a common limiting feature: involvement in monitoring the wearer's program. The qualifying phrase codifies that limit for the whole list. *Second*, read disjunctively the agreement would purport to give "any judicial agency" anywhere unfettered access to the data, which is not what the parties contemplated.

Words and phrases of a contract "must be given their generally prevailing meaning." *IberiaBank Corp. v. Ill. Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020). When the language is unambiguous, courts "look only to the four corners of the contract to interpret it." *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 298 (5th Cir. 2019). The four corners of the offender agreement reach only entities involved in monitoring; they do not reach an investigating agency that learned of the program by chance through a colleague's unrelated viewing of the EM Systems site.

The Monroe Police Department was not “involved in the ordering or enforcement” of Mitchell’s monitoring under any defensible reading. The state court ordered the monitoring; the order did not list MPD as a recipient. ROA.105. Innovative Monitoring Network was the supervising entity named in the order. ROA.270. EM Systems was the chosen monitoring company. ROA.107. According to Cage, the law-enforcement agencies given access to EM Systems’s monitoring information are typically the same agencies that provide the victim information for an exclusion zone, ROA.303, and the Ouachita Parish Sheriff's Office, not MPD, supplied the victim information here, ROA.117.

Even on the broader reading, under which paragraph fourteen reaches any law-enforcement agency anywhere, the scope-of-consent question would still be unanswered. The agreement’s grant of access concerned the monitoring program; it did not authorize the use of that access for any purpose unrelated to the monitoring. The state-court order made the program’s purpose explicit: exclusion-zone enforcement. ROA.104. The objectively reasonable person reading paragraph fourteen against the order would understand the agreement to authorize agencies “involved in the ordering or enforcement of [the] electronic monitoring

program" to use the data *for that program*, not to use the data for entirely separate criminal investigations. Read otherwise, the agreement would convert every bail-condition GPS monitor in the parish into an open-ended surveillance authorization for any law-enforcement officer with the shared log-in credentials. The Fourth Amendment's scope-of-consent doctrine does not stretch that far.

### 2. The consent was not voluntary

The *Soriano* totality-of-circumstances analysis confirms the conclusion. As to custodial status, Mitchell was incarcerated awaiting bail at the time he signed the agreement. "Voluntariness of custodial status turns on whether a reasonable person in the defendant's position would feel free to terminate the encounter," *Soriano*, 976 F.3d at 455, and Mitchell could not. As to coercive procedures, Mitchell's only realistic alternative to wearing the monitor was continued pretrial confinement. As the Massachusetts Supreme Judicial Court explained in an analogous probation monitoring case, the "coercive quality of the circumstance in which a defendant seeks to avoid incarceration by obtaining probation on certain conditions makes principles of voluntary waiver and consent generally inapplicable." *Commonwealth v. Norman*, 484 Mass. 330, 335

(Mass. 2020) (quotation marks omitted). *Norman*'s reasoning, although persuasive rather than controlling, applies with greater force here. A pretrial detainee released on bail is presumed innocent, and the coercive-choice analysis cuts more strongly for a defendant in Mitchell's posture than for the probationer in *Norman*.

The fourth *Soriano* factor, the defendant's awareness of his right to refuse to consent, was developed to measure whether a defendant's consent to a particular search was knowing and could have been withheld. It presupposes a meaningful choice to refuse. Mitchell had no meaningful choice to refuse the ankle monitor itself. The underlying restraint was a state-court order. But the lack of meaningful choice about wearing the monitor is not a concession that Mitchell waived his privacy interest in how the resulting data would be used. The two are different inquiries. The Fourth Amendment privacy interest at issue is the privacy interest in the scope of the monitoring, in what would be tracked, for what purpose, and by whom. It is not the privacy interest in whether monitoring would occur at all. Mitchell's acquiescence to wearing the monitor reflects only the coerced choice the state court forced on him. It does not reflect consent to the use of the resulting data for purposes

beyond the bail-compliance purpose the state court identified. The fourth factor therefore cuts for Mitchell on the only inquiry it can meaningfully address.

The remaining factors confirm the analysis. Mitchell cooperated with EM Systems to secure his release, not with law enforcement to facilitate an investigation. He had no high-school diploma or GED, attended Resource and Special Education classes due to attention-deficit disorder, and dropped out of high school in the eleventh grade. ROA.463. And he had no reason to believe the agreement authorized law enforcement to track his every movement for use in unrelated criminal cases. The agreement language tied access to entities "involved in the ordering or enforcement of" his monitoring, ROA.108, and Cage confirmed the agreement does not state that law enforcement "can log in on your system at any time to investigate a defendant for unrelated criminal matters." ROA.327. Considered as a whole, the totality of circumstances leaves the "definite and firm conviction" that the magistrate erred in finding consent. *Soriano*, 976 F.3d at 455.

## III. The good-faith and independent-source exceptions do not save the GPS-tainted evidence

### A. Standard of review

Application of the good-faith exception is reviewed *de novo*. *United States v. Bell*, 832 F. App'x 298, 301 (5th Cir. 2020) (unpublished) (citing *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992)). A district court's determination that a search warrant affidavit establishes probable cause after the warrant has been purged of potentially "tainted" information is reviewed *de novo*. *United States v. August*, 136 F.4th 595, 601 (5th Cir. 2025).

### B. Legal authorities

Evidence obtained in violation of the Fourth Amendment is generally excluded from a criminal proceeding against the victim of the unlawful search or seizure. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *United States v. Calandra*, 414 U.S. 338, 347 (1974). The "exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

The good-faith exception of *United States v. Leon*, 468 U.S. 897 (1984), and its modern extension in *Herring v. United States*, 555 U.S.

135 (2009), excuse otherwise-suppressible evidence in narrow circumstances. The independent-source doctrine of *Murray v. United States*, 487 U.S. 533 (1988), permits admission of evidence later obtained pursuant to a warrant resting on information genuinely independent of the illegal entry.

### C. Argument

The magistrate concluded that even if the GPS access was unconstitutional, the good-faith exception saves all the evidence Mitchell seeks to exclude. The conclusion rests on two propositions: that "[e]ach warrant was supported by independent and corroborated evidence beyond the GPS ankle monitor data," and that "law enforcement acted in objectively reasonable reliance on the judicial determinations of probable cause." ROA.189-90. Neither holds up on the record.

Before addressing each exception in turn, it is worth mapping the three categories of evidence at issue. The first consists of evidence not tainted by the GPS violation: the April 2 controlled buy, which the evidence established was completed without any use of GPS data, ROA.226-27, and physical surveillance conducted before Cowan accessed the EM Systems program. That evidence is not subject to suppression.

The second category is evidence directly derived from the unlawful GPS access: the GPS data itself, the April 25 controlled buy (which the contemporaneous report confirms was conducted through electronic surveillance of the ankle monitor rather than physical observation, ROA.174, 249-50), and the pattern-of-movement inferences Cowan drew from historical GPS data and incorporated into the warrant affidavits. That evidence must be suppressed as directly tainted.

The third category is evidence derivatively tainted as fruits of the unlawful GPS access: the methamphetamine seized from the gift bag during the May 2 stop (where GPS was one of the factors Cowan used to intercept Mitchell), the contraband recovered from the residence pursuant to a warrant the magistrate found was supported in part by GPS data, ROA.187-88, and Mitchell's post-arrest statement and cell-phone contents, which flowed from an arrest effectuated with GPS assistance. As shown below, neither the good-faith exception nor the independent-source doctrine rescues the second or third categories.

#### 1. Cowan's conduct does not qualify for the good-faith exception under *Leon* or *Herring*

The *Leon* good-faith exception "is confined to the objectively ascertainable question whether a reasonably well trained officer would

have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. The exception presupposes a magistrate-issued warrant. The predicate Fourth Amendment violation here was the warrantless access to the GPS data itself. ROA.261. *Leon* does not save warrantless conduct that turns out to be unconstitutional, even when the officer relied on a later warrant resting in part on the fruits of that conduct. That is what occurred here. Cowan had no warrant when he accessed the GPS data; he obtained warrants only later, for the May 2 residence search and the May 3 cell-phone search, both of which incorporated information he had developed through the unlawful GPS use.

The modern good-faith jurisprudence does not change that result. *Herring* reserved the exclusionary rule for "police conduct [that is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S. at 144. Cowan's conduct meets that standard not because it was malicious, but because it was, by his own description, a deliberate, repeated, and self-documented investigative practice. He had no warrant. He had no magistrate authorization for the GPS access.

He and his fellow officers freely used the shared parish-wide log-in to track Mitchell and others in unrelated investigations. ROA.229, 261. He memorialized that decision in his contemporaneous report, ROA.174, 249-50, and relied on the GPS data again in his arrest-warrant affidavit, ROA.166. The affidavit misstated which monitor he had accessed, identifying a 2022 attempted-murder case ankle monitor rather than the 2024 domestic-abuse-battery ankle monitor he was actually using. ROA.187 (footnote 1). That is the opposite of the "isolated negligence" *Herring* was designed to excuse. 555 U.S. at 137. The exclusionary rule applies precisely to deter the kind of routine, parish-wide, unaccountable warrantless surveillance Cowan engaged in.

#### 2. The warrants were not "supported by independent and corroborated evidence beyond the GPS ankle monitor data"

The magistrate's alternative conclusion rests on a factual premise the record does not support: that the GPS data was used "only to corroborate information already gathered through traditional investigative methods." ROA.186. Cowan's own report contradicts that premise.

The magistrate quotes the report's entry for April 25, 2024: "[i]t should be noted that due to the limited number of narcotic agents . . . conducted surveillance will be electronically monitored to Mitchell being on his ankle monitor." ROA.174; *see also* ROA.250 (Cowan reading the same entry on the stand). The arrest-warrant affidavit reinforces the point: "due to the limited number of Narcotic agents conducting surveillance your Affiant electronically surveyed Mitchell via his ankle monitor." ROA.167. Both documents describe electronic monitoring as the means of conducting surveillance during the April 25 controlled buy itself, not as a corroborative cross-check of facts independently gathered after the fact.

The independent-source doctrine asks (1) whether, after excising any tainted information from the warrant affidavit, the remaining facts establish probable cause; and (2) whether the decision to seek the warrant was prompted by what was seen during the illegal search. *August*, 136 F.4th at 601. Both prongs fail on this record.

On the first prong, the second controlled purchase on April 25 was itself conducted with the aid of the GPS. The report and the affidavit both say so. That means the controlled-purchase recitations in the residence-

search warrant affidavit are not independent of the GPS use. Excising the GPS information from the affidavit requires excising the GPS-aided April 25 buy as well, because the buy itself was facilitated by the GPS surveillance. The April 2 controlled buy is not itself a fruit of the unlawful GPS access — Cowan testified that transaction was completed without any use of GPS data, ROA.226-27 — and it survives suppression. What remains after excision is that untainted buy combined with pre-GPS physical surveillance of Mitchell's residence: meaningful evidence, but not the comprehensive recitation of two controlled buys, sustained surveillance, and pattern-of-trafficking inferences the affidavit relied on to establish probable cause.

On the second prong, the record establishes that Cowan made the decision to track Mitchell's May 2 trip to Houston using the GPS data alongside the license-plate reader. ROA.234, 273 (Tr. 24, 63). The seizure of the methamphetamine from the gift bag during the May 2 stop, the contraband recovered from Mitchell's residence, and the chain of subsequent evidence were "prompted by" the GPS surveillance in the sense *Murray* addressed. 487 U.S. at 542. The independent-source doctrine does not save the residence search warrant.

The license-plate reader, which Cowan also used to locate Mitchell on May 2, does not constitute an independent basis for the traffic stop and cannot insulate the gift-bag methamphetamine from the GPS taint. The officers positioned themselves east of Minden specifically because GPS data disclosed Mitchell's travel route; the license-plate reader cannot show current location or travel route. ROA.234. The decision to intercept Mitchell at that location on that day was itself prompted by and dependent on the GPS surveillance. A lawful tool used in execution of a GPS-prompted plan does not break the causal chain between the illegal search and the evidence obtained. Additionally, the entire sequence — the stop, the flight, the chase, and the seizure — was set in motion by officers acting on GPS-derived intelligence about Mitchell's travel that day.

Mitchell's post-arrest statement and cell-phone contents are also fruits of the unlawful GPS access. ROA.167, 240-41. Mitchell gave his statement after officers arrested him using GPS-assisted surveillance and recovered the gift-bag methamphetamine. Under *Brown v. Illinois*, 422 U.S. 590 (1975), none of the three factors favor attenuation: the temporal proximity between the GPS-assisted arrest and the statement

was immediate; no meaningful intervening circumstance separated the unlawful GPS use from Mitchell's custody and questioning; and Cowan's GPS surveillance was, as detailed above, a deliberate and documented investigative practice rather than an isolated misstep. *Id.* at 603-04. The cell-phone warrant, obtained the day after the arrest, stands no better: a warrant that rests on an investigation set in motion by unlawful GPS surveillance does not attenuate that taint simply because twenty-four hours elapsed.

The exclusionary rule applies, and the magistrate's good-faith and independent-source rulings cannot rescue the GPS-tainted evidence.

## CONCLUSION

At minimum, the GPS data itself, the April 25 controlled buy, and the pattern-of-movement inferences Cowan incorporated into both warrant affidavits must be suppressed as direct fruits of the unlawful GPS access. When those items are excised from the residence-search affidavit, the remaining evidence does not establish probable cause to search Mitchell's home. The three kilograms of methamphetamine recovered from Mitchell's residence, together with all remaining contraband, Mitchell's post-arrest statement, and his cell-phone

contents, are suppressible as downstream fruits of an investigation that could not have reached the May 2 intercept without GPS assistance. Vacatur and remand with instructions to grant suppression is the required remedy.

Respectfully submitted,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: ***s/ Dustin C. Talbot***
DUSTIN C. TALBOT
Appellate Chief
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

***Attorney for the Appellant***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has this day been served by the 5th Circuit electronic filing system on the Assistant United States Attorney, on May 13, 2026.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,495 words.

2. This document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century typeface with a 14 point font.

Lafayette, Louisiana, May 13, 2026.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT